STATE OF NEBRASKA, APPELLEE, V. LEROY JAMES HAND, ALSO
KNOWN AS JIM HAND, APPELLANT.

507 N.W.2d 285

Filed October 29, 1993.   No. S-93-186.

Leo J. Eskey for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ., and MORAN, D.J., Retired.

HASTINGS, C.J.

The defendant, Leroy James Hand, was charged with kidnapping, attempted murder, and use of a firearm to commit a felony. As part of a plea agreement, the State dismissed the attempted murder and weapon charges, and the defendant entered a plea of no contest to the charge of kidnapping. The plea was accepted by the district court, and the defendant was found guilty. Following a sentence classification hearing, the court determined that although the defendant released the

victim alive and in a safe place, he was nevertheless guilty of a Class IA felony under the provisions of Neb. Rev. Stat. § 28-313 (Reissue 1989) because the victim suffered serious bodily injuries at his hands. The court sentenced the defendant to a term of life imprisonment. The defendant appeals. We affirm.

In determining whether evidence is sufficient to sustain a conviction in a bench trial, an appellate court does not resolve conflicts in evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented, which are within a fact finder's province for disposition. A conviction in a bench trial of a criminal case is sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that conviction. The trial court's findings have the effect of a verdict and will not be set aside unless clearly erroneous. *State v. Crowdell*, 241 Neb. 216, 487 N.W.2d 273 (1992); *State v. Oldfield*, 236 Neb. 433, 461 N.W.2d 554 (1990).

On the evening of March 26, 1991, Beth Hand, the victim, arranged for her three young children to visit with their father while she went to work for a few hours. The children's father is her estranged husband, the defendant. She brought the children to her sister-in-law's home, where Hand was then living, at approximately 5:45 p.m. Because of threats to her life, the victim had previously obtained a restraining order against her husband. However, Hand was unusually nice that night when the victim returned to pick up her children at about 8:30.

As the victim was leaving the house, Hand came up the basement stairs carrying a pair of roller skates. The victim, who was placing her two youngest children in the backseat of her car, stood up, and apparently, Hand gave her the skates. According to the testimony of the victim, her oldest child, Nick, was giving her husband a hug, and "as he came down from the hug," Hand pulled a .22-caliber pistol from his pocket and shot the victim in the lower abdomen. After she fell to the ground, he shot her a second time, in her right buttock. Hand's sister, Patti Delaney, had come out the back door, and he turned to her, stood up, pointed the gun at her, and told her to back off. Patti Delaney's husband, Jerome, heard the shots and came to the door. When Hand saw Jerome Delaney at the door, he turned and pointed

the gun at him. Jerome Delaney turned and pushed his own two children back inside the house, ran down the basement stairs to the nearest phone, and attempted to call the police, but the phone would not work.

The victim testified that she could not walk and that Hand dragged and carried her to the backseat of his car, which was across the street. The victim was not cooperating and was trying to get out of the car as Hand shoved her into the backseat and hit her hard on the thigh about three times, before finally slamming the door. Nine-year-old Nick was screaming and trying to open the car doors, and he was still running around the car when Hand put the car in reverse and "floored it."

Hand recalled telling his wife that he had to get her to a hospital. He stated that his car was parked across the street from his sister's house, pointed east, and that he backed out because there were people playing in the street to the east. Hand testified that it was not the normal route he took to the hospital and that he must have "missed the highway." He stated that "the next thing I know it was dark and I was lost."

The victim testified that her husband was driving very fast and heading west into the country. Hand spoke of shooting himself and said that she would have to watch. The victim began to talk to him softly and told him to think of their children. She also told him that she was in a lot of pain and did not think she would "make it" if she did not get help. The victim stated that Hand's attitude changed all of a sudden, and he finally pulled over at a farmhouse to get help. Eventually, a rescue squad arrived, and the victim was taken to the hospital, where her postoperative diagnosis was stated as "gunshot wound to the abdomen with multiple perforations of distal small bowel, perforation of the right ovary, laceration of the right uterine artery and possible perforation of the lower rectum." She was hospitalized for 11 days for treatment of her injuries. Approximately 3 months later, the victim was hospitalized again for 10 or 11 days for additional surgery necessitated by those injuries. Her medical bills totaled $27,242.30.

Hand was arrested and later charged with kidnapping, attempted murder, and use of a firearm to commit a felony. The

State dismissed the attempted murder and weapon charges in return for the defendant's plea of no contest to the charge of kidnapping, pursuant to *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970). However, with respect to the kidnapping charge, the defendant asserted that any serious injury the victim suffered was not inflicted during the course of the abduction and that the sentence should be for a Class II felony, as opposed to a Class IA felony as set forth in the information.

The parties agreed to submit evidence for a determination by the court as to the serious bodily injury requirement of the kidnapping charge, for the purpose of sentencing. In its order of February 2, 1993, the court found "that the victim herein was either voluntarily released or liberated alive by the abductor in a safe place; however, that the victim had suffered serious bodily injury; and that, therefore, the Court determines that this is a Class IA felony." The defendant was sentenced to life imprisonment and asserts on appeal that the district court "erred in finding the Appellant guilty of kidnapping as a Class 1A [sic] Felony as the record clearly indicated that the Appellant voluntarily released his wife alive in a safe place."

Section 28-313 provides in pertinent part:

> (2) Except as provided in subsection (3) of this section, kidnapping is a Class IA felony.
>
> (3) If the person kidnapped was voluntarily released or liberated alive by the abductor and in a safe place without having suffered serious bodily injury, prior to trial, kidnapping is a Class II felony.

Section 28-313 creates a single criminal offense and not two separate offenses, even though it is punishable by two different ranges of penalties depending on the treatment accorded to the victim. The factors which determine which of the two penalties is to be imposed are not elements of the offense of kidnapping, but are simply mitigating factors which may reduce the sentence of those charged under this section, and their existence or nonexistence should properly be determined by the trial judge. *State v. Schneckloth, Koger, and Heathman*, 210 Neb. 144, 313 N.W.2d 438 (1981).

The parties agree, and the record reflects, that the victim was

released alive in a safe place. However, while the defendant does not dispute the fact that he shot his wife, he contends that the shooting was a separate act from the kidnapping and that therefore the victim did not suffer serious bodily harm in the course of the kidnapping.

The act of shooting the victim was not remote in time or place from the act of kidnapping, and there is ample support in the record for finding that the victim's injuries were suffered during the abduction.

The evidence supports the conclusion that the defendant had preplanned some sort of abduction. He had taped down the door locks, wedged the door handles, and removed the window cranks for the back windows of his car. He testified at the sentencing hearing that he did this in order to take his children away for the weekend, an idea which he later abandoned. However, when he was questioned the morning after the arrest about the condition of the car, he told a police officer,

> I just didn't want her jumpin out or try anything crazy, just cause she last time when we started talkin, she finally flipped out and, and it was drivin her crazy and I thought, oh . . . probably it could kinda help her to relieve some tension and that's why I kinda made the doors so she couldn't jump out or hurt herself . . . .

He also admitted that before the incident occurred, he had cut the phone wires in his sister's house because he wanted some time, and he stated, "I didn't want everybody to freak and call the cops here, down and make a big scene . . . I didn't plan on this to be a big production."

The victim told the police that after she was shot her legs were numb and that when she could not get in the car, her husband took her legs and made her do a backflip into the car. She also stated that when her husband started to get in the driver's side of the car, she opened the door and was going to get out when her husband "hopped around and hit me in the face three times and he stuffed me back in." The defendant stated that the victim "had a hard time gettin in there or didn't want to go really" and that he remembered "pushing her in" and "that's how she got hurt in the face."

On the evening before this incident occurred, the defendant wrote a letter in which he stated: "Now it's my turn to do the

damage. To [sic] bad I can't torture her more. I'll never have time. They'll never take me alive. To [sic] bad for the children." Patti Delaney also told police that the defendant had threatened to kill his wife in the past. She stated that the defendant spoke of "making it as painful as he possibly can . . . he's talked about taking her up in their attic, just to find a way of doin it and cuttin her up and leaving her there."

The defendant testified that he intended to take his wife to the hospital, and he argues in his brief that his actions were designed to help, not harm, his wife. Yet, it is noteworthy that he did not put her in her own car or his brother-in-law's vehicle, which were parked in the driveway, but, instead, carried and dragged her across the street to his own car. He also threatened his sister and brother-in-law so they would not interfere. Although the defendant is a licensed emergency medical technician, he did not offer his wife any immediate medical assistance. Finally, although he had been employed at Memorial Hospital in Fremont for 8 years and left his sister's home in the same town to drive his wife to the hospital, he stated that he got lost.

The evidence supports a finding beyond a reasonable doubt that the victim suffered serious bodily injury in the course of a kidnapping. Thus, the district court did not err in finding that the kidnapping should be classified as a Class IA felony for the purposes of sentencing, and the defendant's assignment of error is without merit.

Similarly without merit is the defendant's contention that he should be resentenced. Neb. Rev. Stat. § 28-105 (Reissue 1989) provides that the penalty for a Class IA felony is life imprisonment. A sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion by the trial court. *State v. Ellen*, 243 Neb. 522, 500 N.W.2d 818 (1993); *State v. Philipps*, 242 Neb. 894, 496 N.W.2d 874 (1993). Section 28-105 does not grant discretion in the sentencing of a Class IA felony, and therefore, it was not an abuse of discretion to impose the statutorily required sentence of life imprisonment.

The judgment of the district court is affirmed.

AFFIRMED.

SHANAHAN, J., not participating.